UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NORFOLK FINANCIAL CORP. <br> Plaintiff, <br><br> v. <br><br> OUSLEY FINANCIAL GROUP LLC <br> Defendant. | **05 1 0 9 4 1 RCL** <br><br> CIVIL ACTION NO. <br> RECEIPT # _____ <br> AMOUNT $ _____ <br> SUMMONS ISSUED___ <br> LOCAL RULE 4.1_____ <br> WAIVER FORM _____ <br> MCF ISSUED_____ <br> BY DPTY. CLK._____ <br> DATE_____ |

**COMPLAINT AND JURY DEMAND**

INTRODUCTION                    MAGISTRATE JUDGE____

1.    By this action the Plaintiff Norfolk Financial Corp. ("Norfolk") seeks rescission

and relief pursuant to Massachusetts General Laws Ch. 93A §§ 2 and 11 because of fraud,

misrepresentations, and material non-disclosures by the Defendant Ousley Financial Group LLC

("Defendant") that induced Norfolk to enter into a contract pursuant to which Norfolk paid the

Defendant over $300,000 for assets that the Defendant did not own and, therefore, have no value

to Norfolk.  Norfolk is entitled to rescission of its contract, the return of all money paid on the

contract, damages, and attorney's fees.

JURISDICTION AND VENUE

2.    This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because

the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is

between citizens of different states.

3.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a

substantial part of the events and omissions giving rise to Norfolk's claims occurred in this

district.

## THE PARTIES

4.      The Plaintiff Norfolk is a Massachusetts corporation engaged in the purchase and collection of debt. Norfolk has a principal place of business at 1208 VFW Parkway in Boston, Suffolk County, Commonwealth of Massachusetts. Norfolk is a citizen of Massachusetts.

5.      The Defendant Ousley Financial Group LLC is a Missouri limited liability company with a principal place of business at 3512 I-70 Drive, Suite B, Columbia, Missouri. The Defendant is a citizen of Missouri.

## PERTINENT FACTS

6.      In February 2005, Greg Ousley ("Ousley"), acting on behalf of and as agent for the Defendant, and Norfolk's President Daniel Goldstone discussed the possible sale by the Defendant to Norfolk of a debt portfolio of approximately 28,724 accounts (the "Portfolio"). These conversations took place between Ousley in Missouri and Goldstone in Boston.

7.      During the course of these communications, Ousley offered to sell the Portfolio to Norfolk and made various representations to Norfolk concerning the characteristics of the Portfolio and the terms of a possible sale of the Portfolio to Norfolk. Specifically, Ousley represented that the Defendant held good, unencumbered title to the accounts within the Portfolio, and that he would provide Norfolk a chain of title demonstrating that.

8.      In the same period that Ousley was making representations to Goldstone concerning the attributes of the Portfolio and the Defendant's title, he did not disclose that the Defendant did not have good title to the Portfolio accounts; he did not disclose that the Defendant could not provide evidence of a clear chain of title to the Portfolio's accounts. If Ousley or the Defendant had made such disclosures, Norfolk would not have gone forward with the transaction.

2

9.      The condition of Ousley's title to the accounts in the Portfolio was of central importance to Norfolk. Norfolk's intention was to contact the account debtors and engage in standard collection-type activities. Norfolk could not engage in such activities, and its purpose in purchasing the Portfolio would be frustrated, if the Defendant was unable to transfer clear title to the accounts to Norfolk. Norfolk would not have discussed the purchase of accounts as to which the Defendant did not have clear title.

10.     Norfolk could not independently investigate the state of the Defendant's title to the Portfolio's accounts in advance because it did not have the account information necessary to do so. Norfolk was forced to rely on information provided by the Defendant regarding title to the accounts.

11.     In reliance on Ousley's representations and his silence concerning the condition of the Defendant's title to the accounts in the Portfolio, Norfolk and the Defendant as of February 25, 2005 entered into a written Purchase and Sale Contract (the "Contract") for the purchase by Norfolk of the Portfolio. Pursuant to the contract, Norfolk tendered the stipulated purchase price of $307,401. But for Ousley's representations and non-disclosure, Norfolk would not have entered into the Contract.

12.     A true and accurate copy of the Contract is attached as Exhibit A. In pertinent part, the Contract provides:

> On the Transfer Date, [Defendant] shall send to [Norfolk] a chain of title, Bill of Sale and Assignment of Assets . . . which . . . shall sell, transfer, assign . . . to [Norfolk] . . . all right, title and interest of [Defendant] in and to each of the Assets sold, and of the right to collect all principal and/or interest and/or other amounts due . . . .
>
> \* \* \* \* \*
>
> [Defendant] is the sole owner of all right, title and interest in and to the Assets, free and clear of all liens and encumbrances, and has the right to transfer [Defendant's] interest therein to [Norfolk]....

3

(Contract Art. II, Sec. 2.2; Art. VIII, Sec. 8.1(a)). The Defendant did not provide a chain of title. On information and belief, the Defendant is not capable of providing a clean chain of title.

13.    After receiving the Portfolio, Norfolk issued written collection-type notices to debtors whose accounts were part of the Portfolio. Norfolk immediately was contacted by: (1) other companies in the business of purchasing and/or collecting debt who claimed that they owned accounts in the Portfolio as to which Norfolk had issued collection notices; and (2) debtors who claimed that they had been contacted by/were dealing with other companies who purportedly owned their accounts.

14.    On information and belief, other companies hold title to many accounts within the Portfolio, contrary to the representations made by the Defendant to Norfolk prior to execution of the Contract, and contrary to the representations in the Contract itself concerning title to the accounts.

15.    Norfolk has requested that the Defendant provide a chain of title. The Defendant has not done so and, on information and belief, cannot do so. In light of the Defendant's misrepresentations and non-disclosures, the Contract is void.

16.    Norfolk has notified the Defendant of its desire and intent to rescind the Contract, and has demanded the return of its $307,401 payment. The Defendant has refused to refund the payment.

## CAUSES OF ACTION

### COUNT I
### (FRAUD)

17.    All of the preceding allegations are restated and incorporated here.

18.    As detailed above, the Defendant made multiple misrepresentations concerning the Defendant's title to the accounts in the Portfolio.

4

19.    As detailed above, the Defendant failed to disclose the true state of its title to the accounts in the Portfolio and the fact that the Defendant did not hold good title to all, if any, of the accounts in the Portfolio.

20.    These misrepresentations and nondisclosures were material because Norfolk would not have purchased the Portfolio but for the misrepresentations and nondisclosures, and with the benefit of truthful information concerning title to the accounts in the Portfolio.

21.    Norfolk reasonably relied on the Defendant's misrepresentations and nondisclosures in negotiating and entering into the Contract and in tendering to the Defendant the purchase price for the Portfolio.

22.    As a consequence of its reliance on the Defendant's misrepresentations and nondisclosures, Norfolk tendered the Contract price and has suffered damages.

COUNT II
(Negligent Misrepresentation)

23.    All of the preceding allegations are restated and incorporated here.

24.    As detailed above, the Defendant negligently made multiple misrepresentations concerning the Defendant's title to the accounts in the Portfolio.

25.    As detailed above, the Defendant negligently failed to disclose the true state of its title to the accounts in the Portfolio and the fact that the Defendant did not hold good title to all, if any, of the accounts in the Portfolio.

26.    These negligent misrepresentations and nondisclosures were material because Norfolk would not have purchased the Portfolio but for the misrepresentations and nondisclosures, and with the benefit of truthful information concerning title to the accounts in the Portfolio.

27.    Norfolk reasonably relied on the Defendant's negligent misrepresentations and nondisclosures in negotiating and entering into the Contract and tendering to the Defendant the purchase price for the Portfolio.

28.    As a consequence of its reliance on the Defendant's negligent misrepresentations and nondisclosures, Norfolk tendered the Contract price and has suffered damages

COUNT III
(Chapter 93A Violations)

29.    All of the preceding allegations are restated and incorporated here.

30.    The negotiations between Norfolk and the Defendant and the execution of the contract between Norfolk and the Defendant occurred at arms length in the course of trade or commerce.

31.    The negotiations between Norfolk and the Defendant and the execution of the Contract between Norfolk and the Defendant occurred primarily and substantially in Massachusetts.

32.    The conduct of the Defendant as detailed above was intentional, willful, unfair, and deceptive in violation of G.L. c. 93A §§ 2 and 11.

33.    As a consequence of the Defendant's intentional, willful, unfair, and deceptive conduct, Norfolk has sustained actual damages and has incurred attorney's fees.  Norfolk has suffered its damages and incurred fees in Massachusetts.

For all of the foregoing reasons, Norfolk demands judgment against the Defendant as follows:

a.    Declaring the Contract void and rescinding the Contract;

b.    Directing the return to Norfolk of the purchase price of $307,401, plus interest;

c.    Awarding Norfolk its actual damages for the Defendant's unfair and deceptive conduct;

d.    Awarding Norfolk multiple damages for the Defendant's unfair and deceptive conduct;

e.    Awarding Norfolk its attorney's fees; and

f.    Awarding such other and further relief as the Court may deem just, including interest and costs.

JURY DEMAND

Norfolk demands a trial by jury.

NORFOLK FINANCIAL CORP.
By its attorney,

John J. O'Connor
BBO # 555251
Peabody & Arnold LLP
30 Rowes Wharf
Boston, MA  02110
(617) 951-2077

PABOS2:JOCONNO:613775_1
14950-91217

7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)___ Norfolk Financial Corp. v. Ousley Financial Group LLC

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   ☐   I.     160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ☐   II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
                740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases

   ☒   III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                380, 385, 450, 891.

   ☐   IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                690, 810, 861-865, 870, 871, 875, 900.

**05   10941 RCL**

   ☐   V.     150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

     None

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

             YES ☐   NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

             YES ☐   NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

             YES ☐   NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

             YES ☐   NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

             YES ☒   NO ☐

   A.   If yes, in which division do all of the non-governmental parties reside?

      Eastern Division ☒   Central Division ☐   Western Division ☐

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

      Eastern Division ☐   Central Division ☐   Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

             YES ☐   NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME ___ John J. O'Connor

ADDRESS ___ Peabody & Arnold, LLP, 30 Rowes Wharf, Ste. 600 Boston, MA  02110

TELEPHONE NO. ___ 617-951-2100

(Coversheetlocal.wpd - 10/17/02)

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Norfolk Financial Corp.

## DEFENDANTS

Ousley Financial Group LLC

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

John J. O'Connor, Peabody & Arnold LLP
30 Rowes Wharf, Boston, MA  02110
617-951-2100

ATTORNEYS (IF KNOWN)

# 05  10941  RCL

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
#### PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

#### PERSONAL INJURY
- ☐ 362 Personal Injury — Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

#### PERSONAL PROPERTY
- ☒ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
#### HABEAS CORPUS:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS — Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Defendant commited fraud, negligent misrepresentation and intentional, willful unfair and deceptive acts all against the plaintiff.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $ +307,401

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE

May 6, 2005

SIGNATURE OF ATTORNEY OF RECORD

John J. O'Connor

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

EXHIBIT A
05-10941 RCL

# PURCHASE AND SALE CONTRACT

## DATED AND EFFECTIVE AS OF February 25th, 2005

### BY AND BETWEEN

SELLER:     Ousley Financial Group

### AND

BUYER:     Norfolk Financial Corporation

BUYER INFORMATION:

ADDRESS:     Norfolk Financial Corporation
             1208 VFW Parkway, Suite 201
             Boston, MA 02132
             Attn: Daniel Goldstone, Esquire

TELEPHONE NO.:    617-323-1533 x115

FAX NO.:          617-323-4605

SALE DATE:        February 28th, 2005

CUT-OFF DATE:     February 28th, 2005

PURCHASE PRICE:   $ 307,401.00

DEPOSIT:          $ 0.00

PURCHASE PERCENTAGE:     (.0040) Forty Basis Points

BALANCE OF PURCHASE PRICE DUE SELLER:     $ 307,401.29

Payable in full by Friday, February 25, 2005

2/28/2005



# INDEX TO DEFINED TERMS

| Term | Defined in Article/Section |
|------|---------------------------|
| Advisor | Recital 2 |
| Agreement | Preamble |
| Assets | Recital 1 |
| Asset Schedule | 1.1 |
| Assignee | Exhibit III |
| Assignor | Exhibit III |
| | |
| Bid | 1.2 |
| Bill of Sale and Assignment of Assets | 1.3 |
| Business Day | 1.4 |
| Buyer | Preamble |
| | |
| Claim | 1.5 |
| Cut-off Date | 1.6 |
| | |
| Debt | 1.7 |
| Deposit | 1.8 and 2.4 |
| | |
| Evidence of Indebtedness | 1.9 |
| | |
| Financial Instruments Trust Account | 1.10 |
| Funding Date | 1.11 |
| | |
| Obligor | 1.12 |
| | |
| Purchase Price | 1.13 |
| | |
| Replacement Asset | 1.14 |
| Repurchased Asset | 1.15 |
| Retained Claims | 1.16 |
| Retention Price | 1.17 |
| | |
| Sale | Recital 2 |
| Seller | Preamble and 1.18 |
| | |
| Transfer Date | 1.19 |
| Transfer Documents | 1.20 |
| | |
| Unenforceable Asset | 1.21 |
| Unpaid Balance | 1.22 |
| Wire Transfer Instructions | 1.23 |



## SCHEDULE OF EXHIBITS

EXHIBIT I:    Identity of Seller Entity

EXHIBIT II:   Asset Schedule

EXHIBIT III:  Bill of Sale and Assignment of Assets

EXHIBIT IV:   Wire Transfer Instructions

EXHIBIT V:    Sealed Bid Form and Registration Form



# PURCHASE AND SALE CONTRACT

THIS PURCHASE AND SALE CONTRACT ("**Agreement**") is dated and effective as of the day and year as set forth on the cover page of this Agreement by and among Seller, as specified on Exhibit I of this Agreement ("**Seller**"), and the Buyer more specifically identified on the cover page to this Agreement and incorporated herein ("**Buyer**").

## RECITALS

Recital 1.   Seller desires to sell certain financial assets ("**Assets**").

Recital 2.   Not applicable to this sale.

Recital 3.   Buyer was the successful bidder for purchase of the Assets identified on the Asset Schedule attached hereto as **Exhibit II** for the consideration and under the express terms, provisions, conditions and limitations as set forth herein.

Recital 4.   Seller is willing, subject to the express terms, provisions, conditions, limitations, waivers and disclaimers as may be expressly set forth herein, to sell, transfer, assign and convey to Buyer all of Seller's right, title and interest, if any, in, to and under the Assets identified on **Exhibit II**.

NOW, THEREFORE, in consideration of the mutual promises herein set forth and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated:

Section 1.1.   **"Asset Schedule"** means the schedule describing the Assets purchased under this Agreement attached as **Exhibit II** hereto, including the computer disk or tape describing the Assets for due diligence purposes.

Section 1.2.   **"Bid"** means that certain cash bid or offer amount made by Buyer for the Assets at the Sale and accepted by Seller.

Section 1.3.   **"Bill of Sale and Assignment of Assets"** means the document to be signed and delivered in accordance with Section 3.1 to Buyer on or before the Transfer Date with respect to the Assets purchased under this Agreement, substantially in the form attached hereto as **Exhibit III**, together with the Asset Schedule.



Section 1.4. **"Business Day"** means a day that is not a Saturday, Sunday or legal holiday recognized by the Federal Government.

Section 1.5. **"Claim"** means any claim, demand, cause of action, judgment, loss, damage, liability, cost and expense (including reasonable attorneys' fees, whether suit is instituted or not), whether known or unknown, liquidated or contingent.

Section 1.6. **"Cut-off Date"** means Monday, February 28th, 2005, the date that the contract has been presented to the Buyer by the Seller, and has been removed from the marked as an available purchase, due to the verbal agreement between Buyer and Seller..

Section 1.7. **"Debt"** means the obligations for the Assets being sold pursuant to this Agreement as identified in the Asset Schedule (Exhibit II) and listed on the computer disk or tape provided for collection and due diligence purposes ("computer disk or tape"). Nothing in this definition shall be deemed to imply that the Debts are enforceable; the Debts may include Unenforceable Assets, as defined in this Agreement.

Section 1.8. **"Deposit"** means that amount which has or may be paid by Buyer as specified on the cover page of this Agreement.

Section 1.9. **"Evidence of Indebtedness"** means with respect to each Asset: (a) each available credit application (**"Application"**), or other available credit agreement between Obligor and Seller, for such Asset, judgment, deficiency or charge-off; and (b) any other available evidence as mutually agreed upon by Purchaser and Seller, including, without limitation, any Asset payment history data or computer printouts, creditor notations or any other Asset summary information upon which a creditor could reasonably rely in asserting that the same represents a balance due and owing on a right of collection. The term "Evidence of Indebtedness" does not include any correspondence, reports, information, internal analysis which is unrelated to enforcement of the Asset or any attorney-client privileged materials or memorandum, credit information, regulatory reports, and/or internal assessments of valuation prepared for or on behalf of Seller. **THE EXISTENCE OF AN EVIDENCE OF INDEBTEDNESS SHALL NOT BE DEEMED TO IMPLY THAT THE DEBT EVIDENCED THEREBY IS ENFORCEABLE. THE EVIDENCE OF INDEBTEDNESS MAY BE SUBJECT TO BANKRUPTCY OR OTHER ENFORCEMENT OR COLLECTION RESTRICTIONS.** Evidence of Indebtedness may include, without limitation, original documents or copies thereof, whether by photocopy, microfiche, microfilm or other reproduction process. THERE IS ALSO NO GUARANTEE THAT AN EVIDENCE OF INDEBTEDNESS IS AVAILABLE FOR SAID ACCOUNTS. Seller shall make an honest attempt to obtain and transfer any and all Evidence of Indebtedness to the Buyer, but does not guarantee the availability of such documentation.

Section 1.10. **"Financial Instruments Trust Account"** means the account established by Seller for the Purchaser to wire transfer the purchase price of the portfolio to.



Section 1.11. **"Funding Date"** means no later than Monday, February 28th, 2005, the date established by Seller at which time the balance of the Purchase Price due hereunder must be paid and received by the Seller via wire transfer.

Section 1.12. **"Obligor"** means with respect to each Asset, the Obligor(s) specified in the Asset Schedule (Exhibit II), including, without limitation, any and all makers, guarantors, sureties or other persons or entities liable for the Debt.

Section 1.13. **"Purchase Price"** means the price submitted (bid percentage times Current Unpaid Balance of Assets) by Buyer and accepted by Seller at the Sale to purchase such Assets. The Purchase Price is set forth on the cover page of this Agreement.

Section 1.14. **"Replacement Asset"** means, where applicable, an asset that replaces an Asset of similar age, region and approximate balance, which has been repurchased or replaced by the terms of this Agreement. The asset(s) is to not have been collected by more outside collection agencies than the Asset(s) being replaced.

Section 1.15. **"Repurchased Asset"** means, where applicable, the repayment of Purchase Price of an individual Debt under the terms of this Agreement.

Section 1.16. **"Retained Claims"** means with respect to each Debt, the claims or causes of action retained by Seller pursuant to Article XV.

Section 1.17. **"Retention Price"** means that amount calculated in accordance with the provisions of Section 5.2.

Section 1.18 **"Seller"** means the entity specified as Seller on Exhibit I of this Agreement and shall include all predecessors of Seller.

Section 1.19. **"Transfer Date"** means Monday, February 28th, 2005

Section 1.20. **"Transfer Documents"** means the Bill of Sale and Assignment of Assets as provided in Exhibit III of this Agreement and such other documents, as Seller, in its sole and absolute discretion, deems appropriate for the transfer of its right, title and interest in and to the Assets purchased by Buyer pursuant to this Agreement.

Section 1.21. **"Unenforceable Asset"** means a Debt that is or may be legally unenforceable or uncollectible as of the Cut-Off date for one of the following reasons: (i) all Obligors have been released of liability for their respective Debt by a court of competent jurisdiction or by Seller; (ii) the Obligors have been discharged in bankruptcy without any reaffirmation of the Debt by the Obligors; (iii) all Obligors are deceased and the estate(s) of the deceased Obligors have been closed; (iv) all Obligors have filed for protection under the United States Bankruptcy Code and there is no secured claim relating to the Debt that could be enforced by any owner of the Debt and there is no proposed or confirmed plan of repayment or organization that would provide for payment of any funds; (v) the Debt was created by an act of fraud; or (vi) a settlement arrangement

has been made between Obligor and Seller. Seller makes no representations or warrants regarding the number of unenforceable assets included in this portfolio.

4



Section 1.22. **"Unpaid Balance"** means as to any Asset, at the time of the Cut-Off Date, the total outstanding unpaid current balance, as shown on Seller's books and records (which may include amounts due in respect of purchases, cash advances, finance charges, late fees, return check charges, overlimit fees, other related costs and charges, as of the Asset's charge-off date, minus payments or adjustments).

Section 1.23. **"Wire Transfer Instructions"** means the instructions for wire transferring any portion of the Purchase Price as set forth on **Exhibit IV** attached hereto.

## ARTICLE II
## PURCHASE AND SALE OF THE ASSETS

Section 2.1. *Agreement to Sell and Purchase Assets.* Seller agrees to sell, and Buyer agrees to purchase, the Assets described in the Asset Schedule (Exhibit II), subject to the terms, provisions, conditions, limitations, waivers and disclaimers set forth in this Agreement. The Assets shall be transferred and assigned pursuant to a Bill of Sale and Assignment of Assets purchased hereunder.

Section 2.2. *Agreement to Assign/Buyer's Right to Act.* On the Transfer Date, Seller shall send to Buyer a chain of title, Bill of Sale and Assignment of Assets for all of the Assets purchased hereunder, substantially in the form of **Exhibit III** hereto, executed by an authorized representative of Seller, which Bill of Sale and Assignment of Assets shall sell, transfer, assign, set-over, quitclaim and convey to Buyer, without recourse, warranty or representation, all right, title and interest of Seller in and to each of the Assets sold, and the right to collect all principal and/or interest and/or other amounts due under the Debt(s) and/or other proceeds of any kind paid or collected for payment thereon after the Transfer Date. **Buyer shall have no right to communicate with any Obligor or Obligor's accountants or attorneys or other related third parties or to otherwise take any action with respect to any Asset or any Obligor until after the Transfer Date.**

Section 2.3. *Asset Schedules.* Seller has provided as **Exhibit II** hereto, the Asset Schedule setting forth all of the Assets that Buyer has agreed to purchase hereunder in addition to the computer disk or Tape containing information specific to the Debt.

Section 2.4. *Purchase Price/Payment.* Buyer shall pay to Seller the Purchase Price as follows:

(a)    *Deposit.* Not applicable with regards to this sale.

(b)    *Balance.* On or before 5:00 p.m. (Eastern Standard Time), on the Funding Date(s), Buyer shall pay to Seller the balance of the Purchase Price. All of such funds must be paid in immediately available funds in United States Dollars by wire transfer to the Financial Instruments Trust Account in accordance with the Wire Transfer Instructions (Exhibit IV).

Section 2.5. ***Payments Received/No Adjustments to Total or Package Purchase Price.*** If Seller or any servicing agent receives any credits, payments or other consideration distributed or paid by or on behalf of Obligor with respect to the Debt prior to or on the Cut-off Date, Seller shall be entitled to accept such payments and will reduce the amount of the Unpaid Balance by the amount of such payment. If Seller or any servicing agent shall receive any credits, payments or other consideration distributed or paid by or on behalf of any Obligor, with respect to the Debt after the Cut-off Date, Seller shall pay over and/or deliver such payments to Buyer (without interest thereon from Seller) within sixty (60) days after the receipt of such payment.

**ARTICLE III**
**TRANSFER OF ASSETS AND ASSET DOCUMENTS**

Section 3.1. ***Assignment of Assets and Asset Documents/Paid Off Assets.*** Advisor shall facilitate the execution of this Agreement and the Bill of Sale and Assignment of Assets on or before the Transfer Date via facsimile. Original sets of this Agreement shall be sent via overnight delivery to Buyer and Seller for execution, along with any necessary final data transmission. The Bill of Sale and Assignment of Assets shall have the same effect as an individual and separate Bill of Sale and Assignment of each and every Asset. The responsibility and cost of preparing and executing the Bill of Sale and Assignment of Assets or such other documents as Seller deems necessary, proper and appropriate, to effect the Sale of the Assets hereunder, shall be borne by Seller. However, Buyer agrees, acknowledges, confirms and understands that Buyer shall be responsible for the recording and/or filing of the originals of any such assignments as the same may be necessary, proper or appropriate and shall pay all costs, fees and expenses for the recording and/or filing of such assignments. Seller reserves the right to retain copies of all or any portion of any Asset document(s) delivered by Seller. Notwithstanding anything herein to the contrary, if any Debt is paid off after the Cut-off Date, Seller shall only be responsible for sending to Buyer the funds received by Seller to pay off the Debt after the Cut-off Date in accordance with the procedures set forth in Section 2.5, and Seller shall not be obligated to deliver to Buyer any Transfer Documents relating to such paid-off Asset. In addition, Buyer shall have the sole responsibility to obtain any of the Asset Documents in the possession of any attorneys, collection agencies or foreclosing trustees as set forth in Section 3.5.

Section 3.2. ***Additional Documentation.*** Buyer acknowledges that there may be no available Evidence of Indebtedness as described in Section 1.9. In the event that Buyer requires verification of the debt, Seller agrees to provide affidavits, in a mutually agreeable format and upon Buyer's request, for a fee of $5.00 per affidavit.

Section 3.3. ***Pending Legal Proceedings.*** With respect to any Debt that is, after the Cut-Off Date but prior to the Transfer Date, the subject of litigation, bankruptcy, foreclosure or other legal proceeding, Buyer agrees that it shall, to the extent possible, at its own cost, within thirty (30) days after the Transfer Date: (i) notify the Clerk of Court, any foreclosing trustee and all counsel of record in each such proceeding, of the transfer of the Asset from Seller to Buyer; (ii) file pleadings to relieve Seller's counsel of record from further responsibility in such litigation (unless said counsel has agreed, with Seller's written consent, to represent Buyer in said proceedings at Buyer's expense); and (iii) remove Seller as a party in such action and substitute Buyer as the real party-in-interest, and change the caption thereof accordingly. In connection therewith, after the Transfer Date, Buyer

shall have the sole responsibility to obtain all debt documents then in the possession of any such counsel or foreclosing trustee and to determine the appropriate direction and strategy for such litigation or other legal proceeding, including, without limitation, taking all steps necessary to secure or otherwise facilitate payment under any government loan insurance program. If Buyer fails to comply with the above requirements [(i) through (iii)], Seller may, but is not obligated to take such actions as it deems necessary to effectuate the provisions of this Section. Buyer acknowledges that its failure to comply with the provisions of this Section may affect Buyer's rights in any such litigation or other legal proceeding including, without limitation, any dismissal with prejudice or the running of any statute of limitations if any such action or other legal proceeding is dismissed. Buyer shall reimburse and indemnify Seller for any costs and legal fees incurred by Seller in connection with such proceeding from and after the Transfer Date, including, without limitation, any fees and costs incurred by Seller in connection with Buyer's failure to comply with the above requirements [(i) through (iii)]. Seller shall deliver notice to Buyer of any legal fees and costs billed to Seller incurred in connection with such proceeding from and after the Transfer Date, which Buyer shall promptly reimburse Seller, but not later than five (5) Business Days following Buyer's receipt of such notice, for amounts so incurred.

Section 3.4. *Servicer Records.* In no event shall Seller or any servicing agent be obligated to send or deliver to Buyer the servicer records and/or any working files maintained by the servicing agent, unless otherwise agreed to by Seller.

Section 3.5. *Collection/Contingent Fee.* To the extent that any Asset transferred and sold hereunder is subject to any pending collection and/or contingent fee agreement by which any entity or person is entitled to payment based on the amount of monies collected or judgment obtained and/or collected, then the transfer of such Asset shall be made subject to the rights of any such entity or person, and Buyer has the option to assume the collection and/or contingent fee agreement and, if assumed, shall be bound by the terms thereof to the same extent as if Buyer had independently contracted for such services. Buyer hereby agrees to indemnify, defend and hold Seller harmless from and against amounts claimed to be due under any such collection and/or fee agreement. If Buyer opts not to assume collection and/or contingent fee agreement, the Asset will be subject to repurchase.

Section 3.6. *Notification.* Following the Transfer Date, Seller shall notify its selected credit reporting agencies of the sale and transfer of the Asset(s) to Buyer. In turn, Buyer will notify the Obligor(s) or Debtor(s) of its acquisition of the Assets.

## ARTICLE IV
## SERVICING OF THE ASSETS

Section 4.1. *Interim Servicing/Buyer Bound.* Until the Transfer Date, Seller or any Servicing Agent of the Seller shall continue to service the Assets to be transferred. Buyer shall be bound by the actions taken by Seller and/or servicing agent prior to the Transfer Date. BUYER SHALL TAKE NO ACTION TO COMMUNICATE WITH ANY OBLIGOR OR OBIGOR'S ACCOUNTANTS OR ATTORNEYS OR OTHER RELATED THIRD PARTIES OR ENFORCE OR OTHERWISE SERVICE OR MANAGE SUCH ASSETS OR INSPECT OR EXAMINE ANY COLLATERAL UNTIL AFTER THE TRANSFER DATE. BUYER SHALL TAKE NO

ACTION TO COMMUNICATE WITH ANY SERVICING AGENT OR SELLER'S ASSET MANAGER UNLESS AND UNTIL THE PURCHASE PRICE DUE TO SELLER HEREUNDER HAS BEEN PAID IN FULL. In no event shall Buyer be deemed a third party beneficiary of any servicing contract or agreement between Seller and any servicing agent and in no event shall Seller or any servicing agent be deemed to be a fiduciary for the benefit of Buyer with respect to the Assets, or any of them.

Section 4.2. ***Servicing After Transfer Date.*** The Assets shall be sold and conveyed to Buyer on a servicing-released basis. As of the Transfer Date, all rights, obligations, liabilities and responsibilities with respect to the servicing of the Assets shall pass to Buyer, and Seller and/or its servicing agent shall be discharged from all liability therefore. Seller and/or its servicing agent shall have no obligation to perform any servicing activities with respect to the Assets from and after the Transfer Date.

Section 4.3. ***Buyer Servicer Requirements/Hold Harmless and Indemnity.*** Buyer shall be responsible for complying with all state and federal laws, if any, with respect to the ownership and/or servicing and/or collection of any of the Debts from and after the Transfer Date including, without limitation, the obligation to notify any Obligor of the transfer of servicing rights from Seller or Seller's servicing agent to Buyer. Further, Seller or its servicing agent shall have the right, but not the obligation, to mail a notice addressed to any Obligor at the address shown in its records, notifying such Obligor of the transfer of any Asset or the servicing of the Asset from Seller or the servicing agent to Buyer.

## ARTICLE V
## RETENTION OF ASSET AND REFUND OPTION OF SELLER
## PRIOR TO THE TRANSFER DATE

Section 5.1. ***Seller's Right to Retain Asset(s).*** Prior to the Transfer Date, if Seller determines, in its sole discretion, that any of the following circumstances exist with respect to any Asset or Assets, then Seller shall have the right but not the obligation, to refund to Buyer the Retention Price relating to such Asset(s) calculated pursuant to the provisions set forth in Section 5.2 and withdraw such Asset(s) from the Asset Schedule and from the Bill of Sale and Assignment of Assets, and retain any such Asset or Assets:

(a)     The Asset is participated among different financial entities or depository institutions or is otherwise subject to an agreement between Seller or Seller's servicing agent and another depository institution or third party, which restricts or otherwise limits the sale, transfer or assignment of the Asset or the servicing of the Asset without obtaining the prior consent of such third party; and/or,

(b)     Seller determines that there is a pending or threatened suit, action, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to the Asset or any Obligor for such Asset, and naming Seller or otherwise involving Seller's interest therein in a manner unacceptable to Seller, or Seller otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that



Seller's interest therein cannot be adequately protected without Seller owning such Asset.

Section 5.2. **_Retention Refund._** If Seller determines in its sole discretion that any of the circumstances set forth in Section 5.1 exist with respect to any Asset, Seller shall refund that portion of the Purchase Price relating to such Asset. This refund shall be calculated in the same manner as specified in Section 8.1(b) of this Agreement.

## ARTICLE VI
## NO RIGHT OF REPURCHASE

**OTHER THAN SELLER'S RIGHT TO RETAIN AN ASSET PURSUANT TO ARTICLE V, OR TO REPURCHASE AN ASSET DUE TO A BREACH OF SELLER'S REPRESENTATIONS PURSUANT TO ARTICLE VIII, NEITHER SELLER NOR BUYER SHALL BE ENTITLED TO REQUIRE THE OTHER TO FACILITATE A REPURCHASE OF AN ASSET FOR ANY REASON. BUYER ACKNOWLEDGES AND AGREES THAT THE DEBTS MAY BE UNENFORCEABLE ASSETS AND MAY HAVE LITTLE OR NO VALUE.**

## ARTICLE VII
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer hereby represents, warrants and covenants, to and with Seller, as of the date of this Agreement and as of the Transfer Date that:

Section 7.1. **_No Collusion._** Neither Buyer, its affiliates, nor any of their respective officers, partners, agents, representatives, employees or parties in interest: (i) has in any way colluded, conspired, connived or agreed directly or indirectly with any other bidder, firm or person to submit a collusive or sham bid, or any bid other than a bona fide bid, in connection with the Sale resulting in Buyer being the highest bidder for the Assets subject to this Agreement, or (ii) has, in any manner, directly or indirectly, sought by agreement or collusion or communication or conference with any other bidder, firm or person to fix the price or prices, or to fix any overhead, profit or cost element of the bid price or the bid price of any other bidder at the Sale resulting in Buyer being the highest bidder for the Assets subject to this Agreement, or to secure any advantages against Seller.

Section 7.2. **_Authorization._** Buyer is duly and legally authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject or by which its Assets may be bound and that the undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement.

Section 7.3. **_Binding Obligations._** Assuming due authorization, execution and delivery by each other party hereto, this Agreement and all of the obligations of Buyer hereunder are the legal, valid and binding obligations of Buyer, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law.)

Section 7.4.  *No Breach or Default.*  The execution and delivery of this Agreement and the performance of its obligations hereunder by Buyer will not conflict with any provision of any law or regulation to which Buyer is subject or by which any of its assets may be bound or conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it or any of its assets may be bound, or any order or decree applicable to Buyer.

Section 7.5.  *Assistance of Third Parties.*  Buyer hereby agrees, acknowledges, confirms and understands that Seller shall have no responsibility or liability to Buyer arising out of or related to any third party's failure to assist or cooperate with Buyer.  In addition, Buyer is not relying upon the continued actions or efforts of Seller or any third party in connection with its decision to purchase the Assets.  The risks attendant to the potential failure or refusal of third parties to assist or cooperate with Buyer and/or Seller in the effective transfer, assignment, and conveyance of the purchased Assets, and/or assigned rights shall be borne by Buyer.

Section 7.6.  *Enforcement/Legal Actions.*  Buyer covenants, agrees, warrants and represents that Buyer shall not institute any enforcement or legal action or proceeding in the name of Seller, any subsidiary of Seller, any predecessor, or any servicing agent or make reference to any of the foregoing entities in any correspondence to or discussion with any particular Obligor regarding enforcement or collection of the Assets.  Buyer also represents, warrants and covenants not to take any enforcement action against any Obligor that would be commercially unreasonable and Buyer shall not misrepresent, mislead, deceive, or otherwise fail to adequately disclose to any particular Obligor the identity of Buyer, the owner of the Assets.  Buyer further represents, warrants and covenants not to use, adopt, exploit, or allude to Seller, predecessor, or any servicing agent or any name derived therefrom or confusingly similar therewith or the name of any other local, state or federal agency or association to promote Buyer's sale, enforcement, collection, or management of the Assets.  Buyer agrees, acknowledges, confirms and understands that there may be no adequate remedy at law for a violation of the terms, provisions, conditions and limitations set forth in this Section 7.6 and Seller shall have the right to seek the entry of an order by a court of competent jurisdiction enjoining any violation hereof.  Notwithstanding the foregoing, Buyer may use name of Seller or Seller's predecessor for purposes of identifying any Asset in communications with Obligor in order to collect amounts outstanding on the Asset, in connection with filing suit upon the Asset and in connection with sale of the Asset.  Buyer shall not represent that there is an affiliation or agency relationship between Buyer and Seller, nor shall Buyer state or represent in anyway that Buyer is acting on behalf of the Seller.

Section 7.7.  *Contact with Originating Creditor or Institution.*  Buyer represents, warrants and agrees that in the collection of all Accounts listed in Exhibit II or, in the event, Buyer sells or conveys said Accounts to any third party, Buyer covenants and agrees not to contact or have its agents contact, directly or indirectly, the originating institution/issuer concerning or in anyway relating to any of the listed Accounts and Buyer further agrees to insert a similar provision in any agreement of purchase in the event Buyer transfers any of these accounts.  Buyer further represents, warrants and agrees to contact Seller for any information Buyer may require from the originating institution.  Buyer acknowledges that Seller may seek specific enforcement of this provision in the

event Buyer breaches this provision and may seek actual and/or exemplary damages, together with any attorneys' fees or costs incurred by Seller.

Section 7.8.    *Resale by Buyer.*   If Buyer resells any of the Accounts to any subsequent purchaser, Buyer agrees to require purchaser to expressly assume the obligations of this Agreement as part of Buyer's contract with that purchaser.  Buyer further agrees to attach this Agreement, with the purchase price redacted, as an exhibit to any such contract.

## ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES OF SELLER

Section 8.1.   *Representations and Warranties of Seller*.   Seller hereby represents and warrants to Buyer as of the date hereof:

(a)    *Ownership/Authority.*    Except for the possible existence of collection or contingent fee agreements contemplated under Section 3.5, Seller is the sole owner of all right, title and interest in and to the Assets, free and clear of all liens and encumbrances, and has the right to transfer Seller's interest therein to Buyer on the terms and conditions set forth herein.  Seller has all requisite power and authority to perform all of its obligations under this Agreement and to execute all instruments and other documents contemplated to be executed and delivered by Seller to Buyer in connection herewith.

(b)    *Unenforceable Asset.*   Seller agrees to: (i) refund to Buyer on the terms set forth in this Section, the amount paid for each Unenforceable Asset, determined by multiplying the balance of the Unenforceable Asset by the percentage of the Purchase Price relative to the Unpaid Balance set forth in the Buyer's successful Bid.  Buyer shall, within one hundred and twenty (120) days from the Transfer Date, notify Seller of each Unenforceable Asset with respect to which Buyer seeks such repurchase or replacement and shall supply Seller with evidence satisfactory to Seller that same is an Unenforceable Asset.  Buyer shall deliver all Assets, together with all related Evidence of Indebtedness therefore to Seller. Seller shall pay the refund price or provide a Replacement Asset to Buyer within sixty (60) days from receipt of such notice from Buyer.   Seller shall not be obligated to make payment or replacement on an Asset by Asset basis but may elect to pay such refund or provide such replacement on the sixtieth (60th) day, or more frequently, at Seller's option.  For Assets categorized as bankrupt or deceased the following shall constitute satisfactory evidence:   a copy of the Death Certificate, obituary, Banko scrub notification (or other similar vendor) on their letterhead, LEXIS/NEXIS notification, court documentation, or letter from Obligor's attorney.   For Assets categorized as fraud, the following shall constitute satisfactory evidence:  affidavit signed by the Obligor or police report.

Seller makes no representation or warranty as to the number of Unenforceable Asset(s) which may be included in this Sale.

Section 8.2. *No Other Representations or Warranties.* EXCEPT AS PROVIDED IN SECTION 8.1, THE ASSETS ARE BEING SOLD "**AS IS**" AND "**WITH ALL FAULTS**", WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER, AND SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE ASSETS, THE STRATIFICATION OR PACKAGING OF THE ASSETS. SELLER MAKES NO GUARANTEES OR WARRANTIES AS TO THE AVAILABILITY OF APPLICATIONS, STATEMENTS, RECORDS OR COPIES OF PREVIOUS PAYMENT CHECKS ON ANY ACCOUNT AND BUYER ACKNOWLEDGES THAT SELLER SHALL HAVE NO LIABILITY TO BUYER FOR THE FAILURE TO PRODUCE ANY APPLICATION, PAY HISTORY, STATEMENT, RECORD OR ANY OTHER SIMILAR DOCUMENT.

## ARTICLE IX
## BUYER'S EVALUATION AND ACCEPTANCE OF RISK OF
## ASSETS SOLD "AS-IS"

Buyer hereby represents, warrants, acknowledges and agrees to the following:

Section 9.1. *Independent Evaluation.* Buyer's bid for and decision to purchase the Assets pursuant to this Agreement is and was based upon Buyer's own independent evaluation of information deemed relevant to Buyer, including, but not limited to, the information made available by Seller or Advisor to all potential bidders for the Assets, and Buyer's independent evaluation of related information. Buyer acknowledges and agrees that, while some information concerning the Assets was made available to Buyer for review prior to the Sale, such information, through no fault of Seller, may not be complete. If Seller, an asset servicer, servicing agent or any of Seller's contractors or employees failed to deliver to Seller or Advisor any or all of the Asset information in such servicer's or employee's possession, then neither Seller nor Advisor shall be liable for the failure to include such Asset information in the materials made available for review by prospective bidders prior to the Sale. It is acknowledged that Buyer has relied on representations made in the due diligence file and will rely on account information provided by seller. But, otherwise Buyer has relied solely on its own investigation and it has not relied upon any oral or written information provided by Seller and/or Advisor or its personnel or agents and acknowledges that no employee or representative of Seller and/or Advisor has been authorized to make, and that Buyer has not relied upon, any written statements other than those specifically contained in this Agreement.

Section 9.2. *Due Diligence.* Buyer has been urged by Advisor to conduct such due diligence review and analyses of the information provided by Seller in order to make a complete informed decision with respect to the purchase and acquisition of the Assets.

Section 9.3. *Economic Risk.* Buyer acknowledges that the Assets may have limited or no liquidity and Buyer has the financial wherewithal to own the Assets for an indefinite period of time and to bear the economic risk of an outright purchase of the Assets and a total loss of the Purchase Price for the Assets. Buyer acknowledges that the Assets may be Unenforceable Assets.

## ARTICLE X
## INDEMNIFICATION

Section 10.1. ***Buyer's Indemnification.*** From and after the Transfer Date, Buyer shall defend, indemnify and hold harmless Seller or Seller's agents, affiliates, employees, contractors, officers, directors and representatives against and from any and all liability for, and from and against any and all losses or damages Seller may suffer as a result of any Claim or threatened Claim that Seller shall incur or suffer as a result of: (i) any act or omission of Buyer or Buyer's agents, affiliates, employees, contractors, officers, assignees, directors and representatives in connection with the Assets and Buyer's purchase of the Assets, pursuant to the Agreement; (ii) the breach or inaccuracy of any of Buyer's representations or warranties as set forth in this Agreement and in the other documents executed in connection with the bid and the sale of the Assets or in the Registration and Certification Statement; (iii) the breach of any of Buyer's covenants as set forth in this Agreement and in the other documents executed in connection with Buyer's purchase of the Assets or in the Registration and Certification Statement; or (iv) any Claim or threatened Claim by any Obligor regarding any subsequent assignment, enforcement, servicing or administration of the Assets by Buyer or Buyer's agents, affiliates, employees, contractors, officers, directors, assignees, and representatives.

Section 10.2. ***Seller's Indemnification.*** From and after the Transfer Date, Seller shall defend, indemnify and hold harmless Buyer or Buyer's agents, affiliates, employees, contractors, officers, directors and representatives against and from any and all liability for and from and against any and all losses or damages Buyer may suffer as a result of any Claim or threatened Claim that Buyer shall incur or suffer as a result of: (i) any act or omission of Seller or Seller's agents, affiliates, employees, contractors, officers, assignees, directors and representatives in connection with the Assets and Seller's sale of the Assets, pursuant to the Agreement; (ii) the breach of any of Seller's covenants as set forth in this Agreement and in the other documents executed in connection with Seller's sale of the Assets, or (iii) any Claim or threatened Claim by any Obligor regarding any assignment, enforcement, servicing or administration of the Assets by Seller or Seller's agents, affiliates, employees, contractors, officers, directors, assignees and representatives arising prior to the Transfer Date.

## ARTICLE XI
## ASSIGNMENT OF RIGHTS TO THIRD PARTIES

Section 11.1. ***Assignment of Agreement Prior to Transfer Date.*** Prior to the Transfer Date, Buyer shall not assign, encumber, transfer or convey its rights under this Agreement without the prior written consent of Seller, in each instance, which approval shall not be unreasonably withheld except as provided herein.

Section 11.2. ***Assignment After Transfer Date.*** With respect to any Asset, Buyer and any subsequent owner shall have the right, at any time after the Transfer Date, to assign its rights in, under and/or to any Asset to any subsequent transferee of such Asset; provided, however, that such transferee shall be bound by all of the terms and provisions of this Agreement, and Buyer shall remain liable for all obligations of Buyer to Seller hereunder, notwithstanding such assignment.

## ARTICLE XII
### DEFAULT/RIGHT TO CURE

Section 12.1. ***Remedies for Buyer's Default/Right to Cure.*** In the event Buyer fails to perform any of Buyer's obligations under this Agreement (without the fault of Seller), Seller shall give Buyer written notice thereof, whereupon Buyer shall have fourteen (14) Business Days to cure such failure. If Buyer fails to cure such failure, Seller shall be entitled to terminate this Agreement and seek from Buyer (but not from Advisor) Seller's reasonable actual out-of-pocket expenses and actual damages; in no event shall Seller be entitled to seek specific performance, consequential, punitive or exemplary damages.

Section 12.2. ***Remedies for Seller's Default/Right to Cure.*** In the event Seller fails to perform any of Seller's obligations under this Agreement (without the fault of Buyer), Buyer shall give Seller written notice thereof, whereupon Seller shall have fourteen (14) Business Days to cure such failure. If Seller fails to cure such failure, Buyer shall be entitled to terminate this Agreement and seek from Seller (but not from Advisor) Buyer's reasonable actual out-of-pocket expenses and actual damages; in no event shall Buyer be entitled to seek specific performance, consequential, punitive or exemplary damages.

## ARTICLE XIII
### NOTICE OF OBLIGOR CLAIMS OR LITIGATION

Buyer shall promptly notify Seller of any Claim, threatened Claim, or litigation filed by any Obligor against Seller or Seller's predecessors that arises from or relates to any of the Assets purchased hereunder. .

## ARTICLE XIV
### INFORMATIONAL TAX REPORTING

Buyer hereby agrees to perform all obligations with respect to federal and/or state tax reporting relating to or arising out of the Assets sold and assigned pursuant to this Agreement including, without limitation, the obligations with respect to Forms 1098 and 1099 and backup withholding with respect to the same, if required, for the year 2005 and thereafter. Seller reserves the right to notify Buyer that Seller shall file such reporting forms relating to the period of the year 2005 for which Seller owned the Asset(s).

## ARTICLE XV
### RETAINED CLAIMS

Buyer and Seller agree that the sale of the Assets pursuant to this Agreement shall exclude the transfer by Seller to Buyer of any and all claims and/or causes of action Seller has or may have: (i) against officers, directors, employees, insiders, accountants, attorneys, other persons employed by Seller, underwriters or any other similar person or persons who have caused a loss to Seller in connection with the initiation, origination or administration of any of the Assets; (ii) against any third parties involved in any alleged fraud or other misconduct relating to the making or servicing of

any of the Assets, or (iii) against any appraiser, title insurer or other party from whom Seller or any servicing agent contracted services or title insurance in connection with the making, insuring or servicing of any of the Assets.

## ARTICLE XVI
### WAIVER AND RELEASE

Buyer, its affiliates, officers, directors, successors or assignees thereof, and all subsequent transferees of the Assets, and all others claiming by or through Buyer or subsequent transferees, hereby disclaim and waive any right or cause of action they may now or in the future have against Seller, Advisor, and any of their respective contractor's officers, directors, employees, attorneys, agents, and predecessors in interest as a result of the purchase of the Assets; provided, however, that this waiver and release shall not extend to any liability of Seller arising from Seller's failure to perform its obligations in accordance with the terms of this Agreement. In addition, Buyer, its affiliates, officers, directors, successors or assignees thereof, and all subsequent transferees of the Assets, and all others claiming by or through Buyer or subsequent transferees, hereby release Seller, its contractors, employees, attorneys and their successors and assigns, from any and all Claims arising from or related to the Assets or arising out of the violation of any laws applicable to the transfer of the accounts.

*Assets*

## ARTICLE XVII
### MISCELLANEOUS PROVISIONS

Section 17.1. **Severability.** If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

Section 17.2. **Rights Cumulative/Waivers.** The rights of each of the parties under this Agreement are cumulative and may be exercised as often as any party considers appropriate under the terms and conditions specifically set forth. The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right. Any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

Section 17.3. **Assignment.** Subject to the restrictions set forth in Article XI, this Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including the Addenda, Exhibits and Schedules hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors and assigns.



Section 17.4.  **_Prior Understanding._**  This Agreement supersedes any and all prior discussions and agreements between Seller and Buyer with respect to the purchase of the Assets and other matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

Section 17.5.  **_Integrated Agreement._**  This Agreement and all Addenda, Exhibits and Schedules hereto constitute the final complete expression of the intent and understanding of Buyer and Seller.  This Agreement shall not be altered or modified except by a subsequent writing, signed by Buyer and Seller.

Section 17.6.  **_Governing Law/Choice of Forum._**  This Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the laws of the state (the "**State**") in which the Seller is located as determined by Seller's address set forth on **Exhibit I** hereto.  The parties agree that any legal actions between Buyer and Seller regarding the purchase of the Assets hereunder shall be originated in the district court in and for the State in the county where Seller is located, subject to any rights of removal Seller may have, and Buyer hereby consents to the jurisdiction of said court in connection with any action or proceeding initiated concerning this Agreement and agrees that service by mail to the address specified on the cover page of this Agreement, shall be sufficient to confer jurisdiction over Buyer in such State Court.

Section 17.7.  **_Calculation of Calendar/Business Days._**  If any date (whether calculated on the basis of calendar days or Business Days) upon which or by which action is required under this Agreement is a Saturday, Sunday or legal holiday recognized by the Federal Government, then the date for such action shall be extended to the first day that is after such date and is not a Saturday, Sunday or legal holiday recognized by the Federal Government.

*Signature page to follow.*



IN TESTIMONY WHEREOF, the parties hereto have executed this Agreement.

BUYER: Norfolk Financial Corporation

By: _____

Name (print): _Ithiac W. Goupsose_

Title: _____ Director _____

SELLER: Quincy Financial Group

By: _____

Name (print): _Cathe S. Onbustn_

Title: _Investment_

022805

17

**EXHIBIT I**

**IDENTITY OF SELLER ENTITY**

Name:               Ousley Financial Group

Address:            2000 E. Broadway, Suite 176
                    Columbia, MO 65201-6091

Contact Person:     Greg Ousley

Phone No.:          (888) 743-6340

Fax No.:            (573) 442-1033

2/28/2005

EXHIBIT II

ASSET SCHEDULE

OFG OOS

| Seller Institution Name | Type of Asset | Number of Assets | Approximate Unpaid Balance | As of Date |
|---|---|---|---|---|
| Ousley Financial Group | Resale of Credit Card Accounts Originated by Multiple Lenders | 28,724 | $ 76,849,610.51 | February 28ᵗʰ , 2005 |

A COMPUTER DISK WILL BE SUPPLIED WITH THE CUSTOMER INFORMATION.

Data subject to change prior to Transfer Date.

**EXHIBIT III**

**BILL OF SALE AND ASSIGNMENT OF ASSETS**

The undersigned Ousley Financial Group ("**Assignor**") hereby absolutely sells, transfers, assigns, sets-over, quitclaims and conveys to Norfolk Financial Corporation, a corporation organized under the laws of the Commonwealth of Massachusetts ("**Assignee**") without recourse and without representations or warranties of any type, kind, character or nature, express or implied, all of Assignor's right, title and interest in and to each of the Assets (the "**Assets**") identified in the Asset Schedule ("**Asset Schedule**") attached hereto as **Exhibit II**, together with the right to collect all principal, interest or other proceeds of any kind with respect to the Assets remaining due and owing as of the date hereof (including but not limited to proceeds derived from the conversion, voluntary or involuntary, of any of the Assets into cash or other liquidated property, including, without limitation, insurance proceeds and condemnation awards), from and after the date of this Bill of Sale and Assignment of Assets.

DATED: February 28th, 2005.

ASSIGNOR: Ousley Financial Group

By:_____

Name (print):_____

Title:_____

2/28/2005



**EXHIBIT IV**

**WIRE TRANSFER INSTRUCTIONS**

Bank Name:              Boone National Savings and Loan

Bank Address:           901 E. Broadway
                        Columbia, MO 65205

Bank Telephone:         573-256-3453

Bank Officer:           Brian Nutter

Account Name:           Ousley Financial Group

Account Description:    Company Account

Use Correspondent Bank For Wire

Federal Home Loan Bank
Des Moines, IA
073000914
Credit Account To Boone National Savings Demand Account: 631087049

Ousley Financial Group Account No. 0171503447
ABA No. 281572904

Please indicate that the funds are for Ousley Financial Group.

2/18/2005



**EXHIBIT V**
**(INSERT COPY OF ORIGINAL EXECUTED BID SHEET AND**
**REGISTRATION STATEMENT)**

**Not applicable to this sale.**

